### Serge A. SCHERBATSKOY
v.
### UNITED STATES STEEL CORPORATION and Sperry Rand Corporation.
### Civ. 1867.

United States District Court
N. D. Indiana,
Hammond Division.

June 30, 1960.

As Amended July 5, 1960.

Charles G. Bomberger, Hammond, Ind., Dugald S. McDougall, Chicago, Ill., for plaintiff.

Bean, Brooks, Buckley & Bean, Buffalo, N. Y., Galvin, Galvin, Leeney, Hammond, Ind., for defendants.

SWYGERT, Chief Judge.

The above entitled cause came on regularly for trial and the Court having duly considered the evidence, stipulations of fact, briefs of the parties and oral argument, and being fully advised in the premises now finds the following:

### Findings of Fact.

1. This suit was instituted by the plaintiff, Serge A. Scherbatskoy, as assignee and present owner of the entire right, title and interest in and to the Neufeld United States Letters Patent No. 2,496,103, and as assignee of the sole right to bring and maintain this action.

2. The patentee Neufeld has, by contract with plaintiff a 50% interest in any recovery in this case, and is an interested party.

3. The defendants are United States Steel Corporation, which has a place of business in Gary, Indiana, within the jurisdiction of this Court, and Sperry Rand Corporation, a corporation of the State of Delaware, which has assumed the defense of this action on behalf of United States Steel Corporation, and which has submitted to the jurisdiction of this Court.

4. Sperry Rand Corporation, by merger, is the successor in interest to Remington Rand, Inc. which also was a Delaware Corporation.

5. The patent in suit, No. 2,496,103, is charged to be infringed by electronic computers manufactured, and leased or sold by defendant Sperry Rand Corpora-

tion, and known as Univac and File-Computers, and at the trial the charge of infringement was limited to claims 1, 2 and 8 of said patent.

6. Neither the structure shown and described in patent No. 2,496,103, nor any part of it, has ever been made or tested by the patentee Neufeld, or by the plaintiff, or by any one else.

7. Although five companies have been charged with infringement of patent No. 2,496,103, or had their attention called to said patent, none of them have taken a license thereunder.

8. Although a patent attorney for defendant Sperry Rand Corporation's predecessor, Remington Rand, Inc. considered the matter of a possible license under patent No. 2,496,103, no license was consummated, and no license under said patent has been taken by said defendant or by its predecessor.

9. Patent No. 2,496,103 is directed to an arrangement for recording and reproducing acoustical information, as distinguished from record and statistical information, and utilizes a magnetic tape which is old per se.

10. Patent No. 2,496,103 is also directed to a recording system wherein the tape is moved, during recording, at varying and usually increasing speeds. The only means shown for moving the tape is a motor driving a reel or spool, and as the tape is wound upon the reel it builds up thereon and increases the diameter of the reel drum, thereby causing the tape to move faster. The drive system of the patent creates the problem, inherent in acoustical systems, of providing controls to insure that during reproduction the tape is played back, or moved, at substantially the same varying and increasing speed as occurred during recording, in order to avoid sound distortion.

11. In patent No. 2,496,103, the speed of movement of the tape during reproduction is controlled, through motors, gearing and a rheostat, by a reference signal which is impressed on the tape during recording. The reference signal is in the form of magnetized spots, sixty of which are impressed on the tape in each second, by use of a uniform 60 cycle current source. This means that the number of reference signal magnetized spots varies per foot of tape and that during recording, as the tape moves faster the magnetic spots become fewer per foot of tape.

12. Patent 2,496,103 also impresses speech signals on the same single channel of the tape, in the form of magnetized spots superimposed on the reference signal spots. All frequencies below 100 cycles per second are filtered out so that the information and reference signals on the tape will produce different current characteristics.

13. Patent 2,496,103 also provides for a cycle counter which can be set to zero and which accumulatively count the number of cycles of the reference signal that have occurred to the time of passage of each and every part of the tape through the recording head. An operator can make a note of the cycle count registered at the start and end of a recording, and by referring to his notes can locate any noted part of the tape during reproduction, using complemental circuits and another counter.

14. In the reproduction system, patent No. 2,496,103 discloses only one pick up or reproducing head, and two filters. Such system enables the taking of the superimposed reference signal and information signal off the single channel of the tape, and the separating of them by reason of their different frequency characteristics.

15. The reference signal of patent No. 2,496,103 is used primarily to establish a current to control the relative speed of motion of the tape past the reproducing head. A second use of the current derived from the reference signal is to operate a counter.

16. The reference signal in patent No. 2,496,103 is not used to start the movement of the tape, to stop the movement of the tape, or to reverse the direction of movement of the tape, and such operations are controlled by manual direction.

17. The accused Univac and File-Computers utilize only coded numerical

and alphabetical data comprising record and statistical information. They do not, and cannot, operate to reproduce acoustical information.

18. In the accused Univac and File-Computer, the tape is moved through the Read-Write Head intermittently, and at a uniform speed. The problem of moving the tape at the same varying speed during reproduction, as during recording, does not exist in the accused structures, and the lineal speed of movement of the tape during reading or reproduction therein has no relationship to the lineal speed of movement of the tape during recording.

19. In the accused structures, the coded information is placed on the tape in eight separate channels, in the form of spaced blocks or blockettes of magnetic bits. The magnetic bits are not superimposed on top of one another in the same channel, and the accused structures are not susceptible of such usage. The Read-Write Head has eight pick-up units, corresponding to the eight channels.

20. In the accused structures, each block contains 720 characters, and each blockette contains 120 characters, and each block and blockette contains a corresponding number of sprocket pulse bits in one linear channel.

21. In the accused Univac and File-Computer, the tape is stopped and the information from each block, or blockette, is digested before proceeding to the next block, or blockette. The sprocket pulses are used only as a check, to insure that all of the characters in each block, or blockette, have been read from the tape before proceeding to the next block, or blockette.

22. The Automatic Re-Read of the accused structures simply causes a given block, or blockette, to be re-read, or the operation to stop, if the previous reading thereof was incomplete as sensed by less than a 720 or 120 sprocket pulse count.

23. The current established by the Univac and File-Computer sprocket pulses is not used to control the speed of motion of the tape relative to the Read-Write Head.

24. In the accused structures, the sprocket pulse counting system clears itself, and starts over again, each time a complete block, or blockette, of sprocket pulses are accounted for.

25. The accused Univac and File-Computer sprocket pulse counting system is not used to determine the location of information on the tape, and no visual observation of the sprocket pulse count is made for that purpose. No useful purpose would be served by observing a partial sprocket pulse count in any particular block, or blockette, because the Univac and File-Computer tapes are not programmed for the locating of recorded information in that manner.

26. Information on a Univac and File-Computer tape is located automatically, by the computer itself, through internal comparison of the blocks or blockettes on the tape with an identifier block, or blockette.

27. In the accused File-Computer, a second counter counts only the first sprocket pulse of each blockette of sprocket pulses, and thereby counts the number of blockettes on the tape. This count is used only to determine when the storage limits of the tape have been reached; it is not used in any way to determine the location of specific information on the tape, or to control the speed of motion of the tape relative to the Read-Write Head.

28. Claims 1 and 2 of the patent in suit No. 2,496,103 are substantially the same, for all practical purposes, and call for: a physical medium having a signal impressed thereon; a pick-up element translating the impressed signal into an electric current; means responsive to that current for controlling the relative motion between the medium and the pick-up element; and another means responsive to that current for indicating, in the case of claim 1, the displacement between the medium and the pick-up element and, in the case of claim 2, various portions of the medium.

29. The term relative motion, as used in claims 1 and 2 of the patent in suit, has reference only to the speed at which the medium moves past the pick-up element; it does not include starting, stopping and/or reversing the motion of the medium.

30. The accused Univac and File-Computer structures do not provide means responsive to current derived from an impressed signal to control the relative motion of the tape, in the sense of claims 1 and 2 of the patent in suit.

31. The means responsive to the current for indicating the displacement between the medium and the pick-up element, recited in claim 1 of the patent in suit, and the means responsive to the current for indicating various portions of the member, recited in claim 2 of the patent in suit, comprise the counter used to assist an operator in locating information on the tape.

32. The accused Univac and File-Computer structures do not provide means responsive to current derived from an impressed signal to indicate the displacement between the tape and the pick-up element, or to indicate various portions of the tape, in the sense of claims 1 and 2 of the patent in suit.

33. The accused Univac and File-Computer do not infringe claims 1 and 2 of the patent in suit, No. 2,496,103.

34. Claim 8 of the patent in suit omits the speed control function, and calls for: a physical medium having impressed thereon two signals differing by distinguishable characteristics, with the first signal being recurrently distributed; a pick-up element translating the two signals into two electrical currents having distinguishable characteristics, the first current corresponding to the first signal varying recurrently with respect to time; means connected to the pick-up element and providing two channels for separating the two currents; an indicating element responsive to the first current for indicating the number of recurrences thereof that have elapsed; and a reproducer responsive to the second current for reproducing the same.

35. The distinguishable characteristics called for in claim 8 of the patent in suit comprise different frequencies, enabling the separation of currents derived from superimposed signals.

36. The accused Univac and File-Computer structures do not use superimposed signals, and neither the signals, or bits, nor the currents derived therefrom, have distinguishable characteristics in the sense of claim 8 of the patent in suit.

37. The current corresponding to the sprocket pulses of the accused structures does not vary recurrently with respect to time.

38. In the accused structures, the currents produced from the magnetic bits are always separate, and there are no means connected to the pick-up element and providing separate channels for this purpose, nor is there any need therefor.

39. The indicating element of claim 8 of the patent in suit is for the purpose of locating information on the tape.

40. The accused structures do not provide an indicating element responsive to the sprocket pulse current for locating information on the tape.

41. The accused Univac and File-Computer do not infringe claim 8 of the patent in suit No. 2,496,103.

42. Defendants have offered in evidence, and introduced expert testimony concerning, a number of prior-art patents in support of their affirmative defense that the Neufeld patent is invalid.

43. The Martin patent No. 2,466,251, on which defendants rely in urging invalidity of claims 1 and 2, describes an oil-well winch. It discloses no tape, film, or medium of any kind for carrying an information signal. The steel cable in Martin is a part of the winch and performs essentially the same function as a rope on an ordinary pulley hoist. Martin magnetized his cable at intervals and counted the magnetized spots as they passed into the well, as a means of measuring the length of the cable paid out. Nothing in the Martin patent teaches the use of a repetitive reference signal as a

means of indexing information recorded on a magnetic tape or controlling the movement of such a tape. Further, the field to which the Martin patent relates is so remote from the art of magnetic recording and reproduction that it would not be among the sources to which a person of ordinary skill in such art could reasonably be expected to turn, in seeking ways and means of improving magnetic recorders and reproducers. The Martin patent is non-analogous art.

44. The Whiteley patent No. 2,052,-263, also relied on by defendants, relates to a machine for cutting printed bread wrappers from a long stock roll. The roll used in the Whiteley machine contained a large number of printed labels, each exactly like all the others, and Whiteley's object was to insure that a cutting knife would cut the individual wrappers off the end of the roll at the proper places between the labels. In accomplishing this, he printed on the stock roll a series of marks which were used in conjunction with an electric-eye apparatus to regulate the speed at which the wrapper stock was fed to the automatic cutting knife. Whiteley disclosed no concept of using a repetitive reference signal recorded on a tape as means of indexing the various parts or segments of an information signal recorded on the same tape. In fact, Whiteley's stock roll, even if broadly regarded as a tape, contained no information signal or anything analogous to it. The Whiteley patent disclosed no means for counting the marks on the stock roll, nor did it teach any utility to be derived from such counting. The Whiteley patent, like the Martin patent already mentioned, relates to a field so remote from the art of magnetic recording and reproduction as to be not among the sources of information to which a person of ordinary skill in such art could reasonably be expected to refer for guidance in designing magnetic recording and reproducing apparatus. Hence the Whiteley patent is also non-analogous art.

45. The Shepherd patent No. 2,497,-142 and the Camras patent No. 2,351,005, relied on by defendants as prior art, both disclose systems for recording and reproducing information on tape or film. In neither of these patents, however, is there any disclosure of a repetitive reference signal on a tape, nor is there in them any teaching that such a signal could be utilized for indexing the information content of a tape or regulating its movement. Both the Sheperd and the Camras patents disclose an indexing system comprising a revolution counter geared to a reel on which the tape or film is wound. The counter, in each of those patents, simply indicates how many times the reel has rotated.

46. Leventhal patent No. 1,910,995, another of defendants' prior-art references, disclosed a motion-picture system in which one edge of the film was marked along its length with a series of light and dark zones. Those markings did constitute a repetitive reference or control signal. It was used by Leventhal, however, solely to regulate the rotation of an optical device employed in the projection of his pictures. Leventhal did not employ his reference signal to index, identify, or locate any given parts of the film as opposed to other parts.

47. The Jenkins patent No. 1,909,765, relied on by defendants as prior art against claim 8 in suit, disclosed a talking-picture apparatus in which the film sound track had superimposed on it, in a scattered and random manner, a variety of different control signals with frequency characteristics different from those of the information signal. Those control signals were used by Jenkins to perform auxiliary external functions in connection with the showing of a sound film, such as changing the loudspeaker volume and turning up the theater lights. Jenkins did not disclose any reference signal of a systematically repetitive character and disclosed no counter for counting reference-signal cycles.

48. The subject matter as a whole of the Neufeld invention, as defined in claims 1, 2, and 8 respectively, would not have been obvious at the time the invention was made to a person having ordina-

ry skill in the art of tape recording and reproduction, which is the art to which said subject matter pertains.

49. Claims 1 and 2 of the Neufeld patent in suit define true combinations of elements which cooperate with one another to achieve new and useful functional results.

50. Claim 8 of the Neufeld patent in suit defines a true combination of elements all of which cooperate together to achieve precise indexing of information reproduced from a tape, an important new result unknown to the art prior to Neufeld's invention. Claim 8 is not indefinite.

51. Each of claims 1, 2 and 8 of the Neufeld patent in suit defines a patentable invention.

### Opinion.

The Neufeld patent covers an improvement in the field of magnetic tape recording and reproducing. The improvement involves impressing a repetitive reference signal on the tape which is superimposed on information signals produced by a recording head. The patent provides a means of separating the two signals upon reproduction so that the reference signal can be used for two purposes, (1) to activate a cycle counter to count the number of repetitive reference signals as the tape passes through the reproducing head, and (2) to control the speed of the tape relative to the pick-up head as it passes through the recording head.

There are three claims in issue. Claims 1 and 2 cover a tape recording and reproducing system in which a reference signal is applied to the tape, and, on play-back, the reference signal is employed to indicate the precise position of the tape relative to the pick-up head and also to control the speed of the tape through the head. Claim 8 covers only the use of the reference signal as a counting device to determine the location of that part of the information signal which is being translated from the tape.

### Validity of the Patent.

According to Title 35, U.S.C. § 282, the burden is upon the defendant to establish invalidity. Also according to the statute a patent is presumed valid.

Defendants contend that every essential element described in the claims in issue is disclosed in prior-art patents and that the differences between the Neufeld patent and the prior-art are such that the subject matter as a whole of the Neufeld patent would have been obvious to a person having ordinary skill in the art of tape recording.

None of the prior-art, in my opinion, describes the various elements of the Neufeld invention in combination so as to make it obvious to one of ordinary skill in the tape recorder art that these elements could be adapted to tape recording. Defendants' thesis would require the idea of a reference signal to control the movement of a web of paper in a bread wrapper cutter device, disclosed by Whiteley, to be combined with the idea of using magnetic pulses placed on the cable of an oil-well winch as a counter mechanism disclosed by Martin. Prior-art elements found separately in fields so removed from the one under consideration cannot be combined so as to say that the differences in the prior art and the subject matter of the attacked patent would be obvious to a person of ordinary skill.

The Shepherd and Camras patents do not disclose a repetitive reference signal on a tape. The indexing system shown by these patents is related to the reel on which the tape is wound and does not teach the method disclosed by Neufeld.

The Jenkins patent did not anticipate Neufeld. That patent relates to reference signals placed at random on a film sound track to activate certain controls over theatre lights, loudspeakers, etc. It has nothing to do with indexing or controlling the speed of the tape. Likewise, Leventhal did not disclose an indexing system although he did employ a repetitive reference signal on the edge of a motion-picture film to regulate the

rotation of an optical device used in the projection of pictures.

Defendants also contend that the Neufeld patent is invalid for an aggregation of elements producing no new result or function. "A mere aggregation of old elements or devices which produces no new result or new cooperative function falls short of invention and is not patentable." 69 C.J.S. Patents, § 69 p. 304. The fact that the repetitive reference signals superimposed on the speech or information signals and later separated therefrom to serve both as a means to activate an indexing counter·and as a means to control the relative speed of the tape does not come within the meaning of aggregation. The patent is not an aggregation of old elements simply because the function of indexing is separate from the function of controlling the speed of the tape. These are separate functions which can be realized by employing the Neufeld patent, and both need not be obtained unless desired. But an aggregation of separate functions employing a novel means is something different than an aggregation of old elements making up a device which produces no new function.

It is concluded that defendants have not met their burden to establish invalidity of the patent.

### Infringement.

Plaintiff claims the Univac computer contains a magnetic tape apparatus which infringes the Neufeld patent. The only source of information from which the court can decide the question is the patent itself and certain literature and drawings relating to the Univac computer. The structure described in the patent has never been made, ·nor has any one taken a license under the patent. Consequently, a physical comparison between the patented structure and the accused apparatus is impossible.

The Univac computer employs a magnetic tape system whereby the tape is fed into the computer proper. The information or data fed into computer by the tape is in the form of code which is translated on the tape by means of magnetized spots or "bits" placed, according to the coded data, on seven separate channels running parallel on the tape, each channel going into a separate reproduction or "Read-Write" head. In addition to the information or data channels an extra channel is provided on the tape for the translation to it of "sprocket" impulses, that is, repetitive uniform signals. The coded data fed into the computer by way of characters magnetized on the tape is supplied to the machine in groups. In the large Univac computer the groups consist of 720 characters and are called "blocks". In the smaller "File-computer" the groups consist of 120 characters and are called "blockettes". The sprocket channel impulses are placed uniformly and repetitively along the entire length of a block or blockette as the case may be. In other words, there are 720 repetitive sprocket channel impulses on the tape in the large machine for each block and 120 repetitive sprocket channel impulses on the tape in smaller model for each blockette.

As the magnetic tape is fed into the computer the characters on the tape are "stored" in input storage tanks in groups of 120 characters. There are six storage tanks. The sprocket impulses are used to switch the circuits from the first tank to the second tank after the first tank has received 120 characters and so on until 720 characters have been stored in the six tanks. Thereupon, the sprocket impulses are used to stop the tape momentarily until the computer has had time to "digest" the information in the tanks. The tanks are cleared and then refilled in the manner described. It will be seen that the repetitive sprocket impulses are utilized to control the number of characters placed in each tank and also to control the starting and stopping of the tape as it moves along filling and refilling the storage tanks. The smaller File-Computer operates in a similar fashion except there are "blockettes" of 120 characters instead of blocks of 720 characters. In addition the sprocket impulses on the File-Computer tape are

used to activate a second counter which counts the first sprocket pulse in each blockette. This second counter provides a running indication of the total number of blockettes which have been fed into the computer.

In my opinion there are several substantial differences between the teachings of the patent and the accused structure. (1) While there is a repetitive reference signal imposed on the tape in the Univac apparatus as in the patented device, the sprocket impulses on the Univac tape are on a separate channel and not superimposed on the information signals; consequently, a segregation of reference signals by means of a variance in electric current frequency and of filters is unnecessary in the Univac apparatus. (2) The reference signals in the patented device have no predetermined relationship to the information signals. They are related to the movement of the tape as it comes through the recording head. The Univac sprocket pulses are co-extensive with the information characters. For every information character, there is one sprocket impulse. (3) The Univac sprocket pulses are repetitive only for the length of a block or blockette. In the Neufeld device the reference signal is imposed on the full length of the tape. (4) The Univac sprocket pulses appear on the tape uniformly in relation to where the characters are located. In the Neufeld device, the reference signals are on a constant time basis regardless of the speed of the tape so that, as the speed of the tape varies as it goes through the recording head, the spacing of the reference signals varies on the tape. (5) While in a sense the sprocket impulses on the Univac tape control the speed of the tape as does the reference signals in the Neufeld device, the sprocket impulses start, stop and reverse the tape on Univac, whereas, in the Neufeld device, the reference signals do not start, stop or reverse the movement of the tape. The signals can only be used to control the speed of the tape as it goes through the reproducing head so as to correlate that speed to the same rate of speed that the tape moved at any given point while going through the recording head. As defendants say in their brief, "The whole purpose of Neufeld, and his only disclosed operation, is to vary the speed of the tape as it travels past the reproducing head." (6) The blockette counter in the File-Computer counts the number of blockettes going through the computer; it does not count the total number of sprocket impulses. The Neufeld counter keeps a running total of the reference signals. Thus, an index may be made so as to determine where on the tape certain information signals are located. The counting of sprocket impulses on Univac is for an entirely different purpose.

The most important distinction between the structure in the Neufeld patent and the Univac apparatus, in my opinion, is the fact that the sprocket impulses in Univac control the *movement* of the tape, whereas in the Neufeld structure the *speed* of the tape is controlled by the reference signals. In one, the signals determine whether the tape moves at all and for what length, and also in which direction. In the other, the signals are used to bring about an automatic variance in the speed of tape as it moves through the reproducing head. Plaintiff says, "that both types of control are plainly within the Neufeld inventive concept, as shown in claims 1 and 2, both of which recite apparatus responsive to the reference signal 'for controlling the relative motion' between the tape and the reproducing head." It is true that if only the claims were consulted, it might logically be reasoned that the accused apparatus came within claims 1 and 2. But the claims must be considered in relation to the specifications of the patent. They cannot be separated to the extent that the claims can be said to read on a structure which is fundamentally different in means, operation and result from the one described in the patent. Independent Pneumatic Tool Co. v. Chicago Pneumatic Tool Co., 194 F.2d 945 (7 C.A.1952).

Turning to the claims proper, claims 1 and 2 are for all practical purposes the same. Therefore, claims 1 and 8 will be analyzed with reference to the accused structure.

Claim 1 calls for "an apparatus for moving a physical medium (the tape), said physical medium having impressed thereon a signal * * *." According to the patent this is a 60 cycle reference signal recorded on the tape and superimposed upon the information signal. Plaintiff contends that the "signals" on Univac are the sprocket pulses. The sprocket pulses, however, are not derived from a source having a fixed frequency of 60 cycles per second as described by the patent. Claim 1 also reads in part, "and means responsive to said current for controlling the relative motion between said medium and said pick-up element * * *." Looking to the patent, this language refers to the rheostat with the two synchronous motors arrangement whereby the speed of the tape going through the reproducing head is synchronized to the speed of the tape as it went through the recording head. The Univac apparatus does not control the relative speed of the tape as it went through the reproduction head; that is, it does not vary the speed so as to make it travel through the Read-Write Head at the same speed it went through the recording head. The Univac apparatus stops, starts and reverses the tape and when the tape is moving it moves at a constant speed. Claim 1 also reads in part, "and another means responsive to said current for indicating the displacement between said medium and said pick-up element." This language refers to a counter which accumulates a continual count of 60 cycles, so that as the tape is "played back" any given point of the recording can be ascertained. In the accused structure no such continual count is made so that a determinable part of the coded data fed into the computer can be determined from the counter.

Claim 8 specifies "a reproducer system for reproducing signals from a movable physical medium, said medium having impressed thereon two signals differing one from another by *distinguishable characteristics* * * *." [Emphasis supplied.] In the patent the distinguishable characteristics of the two signals are that one signal is of a uniform 60 cycle frequency and the other of 100 or more cycle frequency and that the one is superimposed upon the other on the same channel of tape. Plaintiff claims the accused device employs two signals which differ "by distinguishable characteristics"; that the sprocket pulses on the one channel are different from the other seven channels of coded data '(comprising the second signal) "in that the sprocket signal consists of uniformly distributed bits or magnetized spots throughout the length of the block or blockette, whereas the bits or magnetized spots that make up the second signal are not uniformly distributed along the tape; moreover, the second signal is physically displaced across the width of the tape from the first or sprocket signal." In my opinion, the distinguishable characteristics called for in the claim are not found in the accused device. The distinguishable characteristics of the sprocket pulses and the coded data on the other seven channels in Univac are fundamentally different from the distinguishable characteristics of the two signals referred to in the claim. The claim also specifies a "pick-up element * * * for translating said two impressed signals into two corresponding electrical currents having distinguishable characteristics * * *."

There is nothing in the accused device that corresponds, to this part of the claim. Univac uses a Read-Write Head with eight separate channel reading units or reproduction heads. Since the signals are already separated by being placed on separate channels on the same tape, there is no need for *translating* two impressed signals into two corresponding electric currents having distinguishable characteristics. Nor does the Univac device use filters which utilize the distinguishable characteristics of the two signals to separate the two currents so that the 60 cycle current will activate a coun-

ter. The meaning of the words found in claim 8, to wit, "means converted to said pick-up element and providing two channels for separating said two currents" must be found in the specifications. When the latter are consulted a filtering arrangement is described.

The foregoing analysis of the claims in issue as they relate to the accused structure compels the conclusion that the claims do not read on the Univac apparatus. Accordingly, there is no infringement.

Conclusions of Law.

1. The Court has jurisdiction of the parties hereto and of the subject matter hereof.

2. Claims 1, 2, and 8 of Neufeld U. S. patent No. 2,496,103 are valid.

3. Claims 1, 2 and 8 of the Neufeld patent in suit No. 2,496,103 have not been infringed by the defendants, or by the defendant Sperry Rand Corporation's predecessor, Remington Rand, Inc.

4. Defendants are entitled to a judgment, adjudging claims 1, 2 and 8 of the Neufeld patent in suit 2,496,103 as valid and not infringed, and awarding to defendants their costs.

Judgment.

This cause having come on to be heard upon the pleadings and proofs, and having been argued by the parties, upon consideration thereof, and upon the findings of fact and conclusions of law entered herein on June 30, 1960,

It Is Hereby Ordered, Adjudged and Decreed:

1. That the Court has jurisdiction of the parties and of the subject matter of this cause.

2. That plaintiff, Serge A. Scherbatskoy, is the owner of U. S. Letters Patent No. 2,496,103.

3. That claims 1, 2 and 8 of U. S. Letters Patent No. 2,496,103 granted January 31, 1950 to Jacob Neufeld for "Indexing and Speed Control System for Magnetic Reproducers" are valid.

4. That defendants, United States Steel Corporation and Sperry Rand Corporation, have not infringed claims 1, 2 and 8 of U. S. Letters Patent No. 2,496,103.

5. That the complaint herein be dismissed.

6. That defendants recover from plaintiff their taxable costs and disbursements.